## Reed *versus* Breeden *et al.*

1. A contract was made for the sale of land, part of the purchase-money to be paid on the delivery of the deed: the deed was executed, the vendee paying then but part of the hand-money: it was left with the attorney with the agreement that if the remainder of the hand-money was not paid at an appointed time all negotiations should end and the deed be destroyed. *Held,* that time was of the essence of the contract.

2. The vendors remained in possession and the deed was destroyed at the appointed time. *Held,* that no question of recoupment of the rents and profits (received by the vendor) against the hand-money to be paid, could arise in an ejectment against the vendor.

3. After the appointed time for payment had passed the vendor sold the land to another person. *Held,* that the bona fides of this sale was of no consequence, the contract with first vendee being at an end.

March 25th and 26th 1869. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. WILLIAMS, J., absent.

Error to the Court of Common Pleas of *Elk county:* No. 337, to January Term 1869.

This was an action of ejectment brought October 7th 1867, by William Reed, against John N. Breeden, James Bradley, William C. Hall, John P. Long, Hiram Carman and R. P. Sallsbury, for the undivided three-fourths of 13,000 acres of land, known as the "Portland Mill Property."

The case was tried, January 12th 1869, before Williams, Additional Law Judge.

It was admitted that the title to the whole property was, on the 1st of January 1863, in John N. Breeden, William Garnett and Alonzo J. Wilcox, Breeden and Garnett owning three-fourths and Wilcox owning one-fourth.

B. F. Lucas, Esq., was called by plaintiff, and a paper being shown him, stated that it was a copy of an original deed which had been burned: he had been directed by the parties to burn it on a contingency which in his judgment had happened. The copy was then given in evidence. The deed, dated the 8th of December 1863, was between J. N. Breeden and William Garnett and A. J. Wilcox, by their attorney in fact, Breeden, of the first part, and W. Reed, the plaintiff, of the second part; it witnessed that the first party, for the consideration of $60,000, conveyed to the second party in fee the undivided three-fourths of the land in controversy, composed of a number of distinct tracts, subject to a mortgage given by the grantors to the Portland Land Company, former owners of the land, for $53,926.26, the balance of the purchase-money, the grantee to pay this sum after deducting all payments theretofore made by the grantors, and all credits to which they were entitled—the amount of the balance so to be paid by the grantee to be part of the $60,000 consideration. The deed was signed and sealed by Breeden for himself, and as attorney for

[Reed v. Breeden.]

Garnett and Wilcox; it was also signed and sealed by Reed. It was acknowledged on the 29th of January 1864 by Breeden for himself and as attorney for the other grantors, and by Reed on the 5th of February 1864. Plaintiff gave in evidence also the following paper:—

"In the settlement made this day between John N. Breeden and William Reed, for an undivided three-fourths of the Portland Property, sold by said Breeden to said Reed, it is understood and agreed that the said William Reed is to pay the taxes upon the said lands for the years 1860 and 1861, together with $2500 additional, required to redeem the said lands from the treasurer's sale, and that the said John N. Breeden is to pay the taxes now due for the years 1862 and 1863. The amount of said taxes for 1860 and 1861, and redemption-money being $1521.50.

(Signed)　　　"JOHN N. BREEDEN.
　　　　　　　　"WILLIAM REED.

"Pittsburg, Pa., Feb. 5th 1864."

with evidence by Mr. Lucas that it was prepared in duplicate at the request of both parties, each keeping an original. They also gave in evidence a draft dated February 5th 1864, William Reed on E. A. Packer & Co., in favor of J. N. Breeden, for $2454.21, with testimony by Mr. Lucas that it was given for what was supposed to be the balance of the $60,000, after deducting the mortgage, the taxes, $100 given by Reed to Breeden to pay for stamps, and $130 claimed by Reed to have been paid by him to Rhinis & Carman. They also gave in evidence draft December 15th 1863, Reed on G. B. Newton, in favor of Breeden & Co., for $1000, with the testimony of A. Wilcox that the draft was to pay several debts of Breeden & Co., (composed of Breeden, Garnett and Wilcox,) principally one due Rhinis & Carman, witness having understood from Breeden that Reed was to have an interest, and was making advances to the firm.

Also the following paper:—

　　　　　　　　　　"Pittsburg, February 5th 1864.

"In the settlement this day made between John A. Breeden and myself, of the amount of purchase-money due on the sale by the said Breeden to me of the undivided three-fourths part of the 'Portland Property,' there was the sum of $15,000 of the notes of W. W. Corbet, now in the hands of St. John Smith, trustee of the Portland Land Company, $11,404 of which the said Breeden claims as a credit upon the mortgage held by the Portland Land Company, and also the sum of $5264.94 which the said Breeden contends should be a credit on the said mortgage of the notes of Corbet and Newcome.

"Now I hereby agree that if the said sums of money, or either

[Reed *v.* Breeden.]

of them, or any part thereof, shall be determined to be proper credits upon said mortgage, that then and in that case I will immediately on such determination by the Circuit Court, &c., pay to the said John N. Breeden, &c., the said sum or sums of money, or so much thereof as the said court may determine to be proper credits·upon said mortgage, together with what interest may have accrued upon such sum or sums of money from the 1st day of November 1863, up to the time the same shall be paid.

"I am also to pay all interest which has or may accrue upon the said mortgage from and after the 1st day of November, A. D. 1863, the amount of the balance remaining unpaid upon said mortgage at the date last aforesaid, being $55,834.45, without deducting the credits claimed by the said Breeden for the said notes of W. W. Corbet and Newcome.

" WM. REED."

They gave evidence from the land-book of the treasurer of Elk county, of redemption of lands May 9th 1864, by Reed, the amount paid by him being $1395.10.    There was other evidence by the plaintiff, for the purpose of establishing his ownership of the land, its recognition by Breeden, payments on account of the purchase-money, &c.    They gave in evidence also deed dated April 7th 1864, from Breeden and Garnett and Wilcox, by Breeden as their attorney, to James Bradley, for the " Portland Mill Property," and the "Beech Bottom Property," consideration $100,000, and deed dated April 15th 1864, from Bradley to J. P. Long and W. C. Hall, for an undivided fourth of the same' property.    Rhines and Carman were lessees of the property.    Rhines died, and Saltzman and Carman have occupied it since.

The plaintiff having closed, the defendants, after some preliminary evidence, gave in evidence a bill filed, February 1st 1864, in the Circuit Court of the United States, by the Portland Mill Company, against Breeden & Co., to foreclose their mortgage— decree for $15,870.48, and payment by J. N. Breeden, February 14th and November 11th 1865, in full.    They called Mr. Lucas, who, under objection and exception by the plaintiff, testified:— That negotiations for the sale by Breeden & Co. of three-fourths of the Portland property to Reed, commenced about the 13th of November 1863.    The terms then agreed on were, that Reed was to pay $60,000 for the purchase; $40,000 to be paid in hand for payment of the mortgage, $15,000 to remain in Reed's hands until a suit by the Land Company was disposed of, and $5000, the balance, also to be paid in hand.    It was agreed that a deed should be made, subject to the $15,000, accompanied by a writing that the $15,000 should be paid to Breeden if he succeeded in his suit.    Reed was not then prepared to pay the $40,000, and proposed to pay $10,000.    Breeden refused to take any less than the

[Reed v. Breeden.]

$40,000, alleging that he had to pay the mortgage at once. It was then arranged that witness should prepare a deed, send it to Louisville, Breeden's residence, for execution, Breeden to notify witness when he would meet Reed to close the business, and witness was to inform Reed. They were to meet at the office of witness, and Reed to pay the $40,000 and the $5000 when the deed was to be delivered. The deed was drawn (the copy of which was given in evidence by plaintiff), returned by Breeden to witness with information that Breeden would be in Pittsburg February 2d to close the agreement. Reed was notified. On the 5th of February the deed was acknowledged by Reed in Pittsburg, and brought to witness's office. Breeden asked Reed for the $40,000. He said he was not ready to pay it. Breeden said he was afraid nothing could be done, as Mr. Blake, the attorney for St. John Smith, trustee of the mortgagees, was then urging payment. Propositions were made by Reed to which Breeden declined to accede, saying that he must have the debt paid, for it was wearing him to the grave, and he would not deliver the deed till it was paid. After other propositions, Reed proposed "that the deed should remain in my hands undelivered; and if Breeden effected an arrangement with the Land Company for the payment of the $40,000 at a particular time, if that time was so far distant that Breeden could give to Reed thirty days' notice of the time, he would pay $40,000 at the day fixed. If the Portland Company, in the mean time, required security in lieu of an injunction to restrain operations on the property, Reed agreed to sign that security; and in case he failed to pay the money at the time stipulated, or to give the security to the company, if security was required, I was to throw the deed into the fire, and all negotiations between them should be at an end." Breeden acceded to this proposition, and also agreed to receive the $5000. The agreement of February 5th 1864 (given in evidence by plaintiff), was written and the draft for the balance of the $5000 drawn. Breeden and Blake met at the office of witness on the 8th of February, and it was agreed that if the $40,000 should be paid on the 1st of April, and security to indemnify the company on account of cutting timber, time would be given. Witness wrote that evening to Reed. A day or two before the 1st of April Breeden came to Pittsburg. Reed had not come. Witness telegraphed to him that Blake and Breeden were there and asked him to come. Reed replied in the same way, that he could not come until the 10th or 12th of April. Witness informed Blake and Breeden of the telegram. On the 8th of April, Breeden, Blake, Bradley and witness met at his office. At that time the whole of the Portland and Beech Bottom property had been sold to Bradley. Witness told Reed that Blake had refused to wait till the 8th or 10th of April on the faith of what Reed would do,

and that the sale to Bradley had been made solely for the purpose of raising money. Reed notified Bradley not to pay any money or take a deed. Witness informed Reed it was too late; both had been done. The deed left with witness was burned by him or Breeden in his presence, on the 7th or 8th of April, at Mr. Purviance's office. They then gave in evidence a letter from Lucas to Reed, dated February 8th 1864, of which the material part is as follows:—

" Mr. Breeden will hand you this. He wishes me to say to you that he wants that payment of the $40,000 made to the Portland Company by the first day of April, at which time he expects to be able to make a payment on the Beech Bottom mortgage, so as to get pretty well cleared of his difficulties in relation to those lands.

" This is in consequence of a new phase which matters have assumed, of which Mr. Breeden can inform you more particularly."

And the reply of Reed of March 1st 1864, viz. :—

" B. F. Lucas, Esq., Pittsburg.

" Dear Sir,—Your favor of the 8th ult. was handed me at Ridgway by Mr. Breeden, who informed me of the arrangement· with Mr. Blake. It appears the latter has at last worried Mr. Breeden into a compromise, which I rather expected he would do in the end.·

" I understood Mr. Breeden to say, that if I agreed to the payment of the $40,000, it would not be necessary to enter bail for the timber cut. I shall try to be prepared at the time named. Please send me the deed from Mr. Breeden by express, addressed to me at No. 59 Trinity Building, New York, care Messrs. E. A. Packer & Co. I have sold one-fourth of the property (one-third of my share), and wish to make the conveyance at once; Mr. Breeden is advised of it."

Also letter of Breeden of March 1st 1864 to Reed :—

" * * We must enter into a bond, with sureties, to St. John Smith, for stumpage, as per agreement, to the amount of $10,000, which is to be cancelled upon the payment of $40,000 upon your purchase, and $7000 upon Beech Bottom, which payments, we believe, will materially relieve us, as explained upon my interview with you at Ridgway, before you left. Will you furnish this security ? * * I have just learned that Lucas has agreed that the security shall be given by the 10th inst. I shall leave here, for Pittsburg, on Monday next. Hope to hear from you there upon my arrival. Do not fully credit the information, as to the time specified, to give this security. It would·be strange that Lucas would

[Reed v. Breeden.]

fix so short a time, without consulting with us. However, as we have it to do, we had better have it disposed of at once."

Also letter from Reed of March 8th 1864 to Breeden:—

"Sir: Owing to my absence from home, your favor of the 1st instant did not come into my hands until last evening. I did not suppose it would be necessary to give security for stumpage, unless we failed to pay the $40,000 on the 1st of April; but if Mr. Lucas will send me the necessary bond, I will find satisfactory security. * * You mentioned to me, at Ridgway, that in case I should want any assistance in making up the $40,000, you would advance upon the lumber. How much can you furnish, if desired—the amount to be paid back out of my share of the lumber? If I give you my note for the amount at three or four months, will it aid you in raising funds?"

There was other evidence by the defendants as to the agreement for the destruction of the deed, &c., and also as to the bona fides of the sale to Bradley.

The defendant gave evidence to contradict the testimony of Mr. Lucas, and also to show that the sale to Bradley was not bonâ fide.

The plaintiff requested the court to charge:—

"1. That if the jury believe that the three writings of the 5th February embraced the agreement of the parties, they together would constitute a contract, which could not be affected by any independent parol agreement to pay a portion of the consideration in a way different from that expressed in the writings.

"2. That before finding the existence of such contract the jury will inquire whether defendants have received in rents, &c., of the property sufficient to reimburse them for the share of mortgage-money which, by the terms of the contract, devolved upon William Reed to pay, and if they find the whole has been thus discharged, they will find for plaintiff, and if the whole has not been paid, they will find for plaintiff a conditional verdict, requiring plaintiff to pay to defendants whatever may be due before his writ of possession shall be allowed to issue.

"3. That if the jury find the existence of a contract, the payment of money upon it, and that Breeden conveyed to Bradley for the purpose of overriding the contract, and paid the mortgage, and thereby prevented Reed from paying it, the plaintiff will be entitled to a verdict, and the defendants turned over to a bill in equity to adjust the equities between the parties.

"4. That if the jury believe the writings of 5th February 1864 embraced all the terms of the agreement of the parties, any parol agreement to destroy the writing of said date, unless there was some consideration for the same, would be nudum pactum, and on

11 P. F. Smith—30

[Reed *v.* Rreeden.]

this point it is for the jury to inquire whether the mortgage due the Portland Company, was in such a shape as to require the immediate payment of $40,000, and if the jury find that no such immediate necessity existed, the plaintiff would be entitled to a verdict.

"5. That if the jury believe the sale to Bradley, and the burning of the agreement of 5th February 1864, if it was burned, was the result of a confederacy between Breeden and Bradley to get rid of the said contract, as well as all liability arising out of the same, and that in pursuance of this confederacy they took possession, and claim to hold the same adversely,—the plaintiff would be entitled to a verdict, without consideration by the jury of the state of the accounts between the parties."

The court, after recapitulating the facts, charged :—

"Upon these facts we are asked by plaintiff's counsel to instruct you in answer to the written points submitted by them, which we now proceed to do.

"1. The instruction asked in the 1st point we give you, if you shall find from the evidence that the deed was actually delivered. But we refuse so to instruct you, if upon examination of all the evidence, you should be of opinion that it was not delivered.

"2. The instructions asked in the 2d point we refuse. This is not an equitable action of ejectment. If the deed was delivered to Reed on the 5th February, he has the legal title, and there is no contract to enforce by this action.

"If the deed was not delivered it was retained in hands of Lucas either first, as a security for the payment of the $40,000 upon the Portland mortgage generally, or second, upon an agreement making time of the essence, such as he has stated upon the stand. If retained in his hands for the first of these reasons, viz. : as a security for the payment of $40,000 upon the Portland mortgage, then payment was a condition precedent to his right to a delivery ; and he should have tendered the amount, with interest, before suit brought, if he meant to proceed upon his contract.

"If retained in the hands of Lucas for the other reason, viz. : because payment on the 1st day of April had been made of the essence of the agreement, and upon failure to make payment the deed was to be destroyed, then, if such agreement was made, fairly, intelligently made—was broken and the deed was burned in pursuance of its terms, the plaintiff has no standing whatever in court.

"Such an agreement is one which it is clearly competent for a party to make. If made and broken, the violation of his agreement concludes the plaintiff at law. [If there is relief for him in equity, it would only be upon and after tender of performance made promptly, showing the vendee to be, in the language of the case, 'prompt and eager' to redress whatever of wrong or injury his default might have occasioned to the vendor. We therefore

[Reed *v.* Breeden.]

instruct you that this action is to be sustained, if at all, for the recovery of a possession wrongfully wrested, or withheld from the plaintiff; and that no account of rents, issues and profits is to be stated between the parties.]

"3. In answer to the 3d point, we instruct you that if you find the deed was delivered to the plaintiff or to Lucas for him, or that it was wrongfully or fraudulently destroyed by Lucas, the law would be as stated on this point, viz.: that the plaintiff would be entitled to recover, and the defendants would be turned over to their action by bill or upon the contract to recover the balance of purchase-money. But if it was rightfully destroyed, in accordance with the plaintiff's agreement, then the bona fides of the conveyance to Bradley is of no consequence.

"4. We decline to charge as requested in this point until delivery of the deed. It was competent for the parties to stipulate in regard to the time when, and the conditions upon which, such delivery should take place; and to provide that upon the failure to comply with such conditions it should not take place at all. Such a contemporaneous verbal agreement, fixing the condition upon which an undelivered deed may be delivered or destroyed, is not *nudum pactum.*

"5. We affirm the 5th point. If the deed was wrongfully burned the plaintiff is entitled to recover the possession from which he has been wrongfully excluded.

"[It follows then, from our answers to these points, that we submit this case to the jury upon a single question. Was the deed of 5th of February 1864 held by Lucas under an agreement such as that to which he testifies, and destroyed in accordance therewith? If it was, the defence set up in this case is complete, and the plaintiff has no right whatever to your verdict.]

"If on the other hand the deed was left with Lucas until the payment of the $40,000, without the agreement making time of the essence, to which he testifies—then its destruction was a grave fraud upon the plaintiff, which cannot be permitted to avail the defendants, or diminish the rights of the plaintiff.

"Looking at this evidence, including the letters which passed between these parties prior to April 8th 1864, and the payments made by Reed to Wilcox and to Carman, you must determine this question. It is, as we have said, the controlling question in the case.

"It is purely a question of fact. The magnitude of the interests depending upon it require that you should give it a careful and an attentive consideration. If you believe the evidence of Lucas, such a contract as justified the burning of this deed, is shown. If you neglect it, or so much of it as relates to this subject, there is then no evidence of a contract left. The case then really depends upon your belief of the testimony of B. F. Lucas. If

[Reed *v.* Breeden.]

you accept his statements of the agreement made between these parties on the 5th February 1864, your verdict should be for defendants. If you reject it, then the plaintiff is entitled to recover the undivided three-fourths of the several tracts described in his writ.''

January 14th 1869. The jury found for the defendants.

The plaintiff took a writ of error, and assigned for error the answers to his first four points, the parts of the charge enclosed in brackets, and admitting B. F. Lucas to testify as to the arrangements between Breeden and Reed in reference to the sale of the Portland property, &c.

*H. Souther* and *J. G. Gordon*, (with whom was *R. Brown*), for the plaintiff in error.—The effect of a notice to rescind a contract depends upon the previous conduct of the party : N. American Oil Co. *v.* Forsyth, 12 Wright 291 ; 1 Parsons on Contr. 514. The notice was not sufficient: Demalt *v.* Leonard, 19 Howard Prac. Reports 132 ; Greenawalt *v.* Kreider, 3 Barr 264. There should have been an account for rents and profits : Cox *v.* Henry, 8 Casey 18 ; Adams *v.* Smith, 7 Harris 182. The parol evidence was not sufficient to destroy or vary the deed: Chalfant *v.* Williams, 11 Casey 215 ; Starkie on Evid. Part 4, p. 1009 ; 1 Greenleaf on Ev. sect. 398 ; 2 Parsons on Contr. 548 ; Holliday *v.* Hart, 30 N. York Rep. 474 ; Renard *v.* Sampson, 12 Id. 161 ; Storch *v.* Carr, 4 Casey 135 ; Heebner *v.* Worrall, 2 Wright 376 ; Miller *v.* Smith, 9 Casey 386 ; Fulton *v.* Hood, 10 Id. 365 ; Miller *v.* Fichthorn, 7 Id. 252. When time is not of the essence of a contract equity will relieve from strict performance : Townsend *v.* Lewis, 11 Casey 125 ; Larison *v.* Burt, 4 W. & S. 27. The rights of the parties can be protected by a verdict, tender is not necessary: Devling *v.* Williamson, 9 Watts 318 ; Hawk *v.* Greensweig, 2 Barr 295.

*M. W. Acheson* and *J. G. Gordon* (with whom was *J. G. Hall*), for defendants in error.—The case is not within the Statute of Frauds : McFarson's Appeal, 1 Jones 510 ; Parkhurst *v.* Courtland, 1 John. Ch. R. 274 ; Soles *v.* Hickman, 8 Harris 180 ; Hammer *v.* M'Eldowney, 10 Wright 334. Delivery of the deed is for the jury : Critchfield *v.* Critchfield, 12 Harris 100. As to the parol evidence : Boardman *v.* Dean, 10 Casey 252. The delivery of the deed to Reed by Lucas under the circumstances would not have availed : Robins *v.* Bellas, 2 Watts 359. Delivery depends upon the intention of the parties, which is for the jury : Arrison *v.* Harmstead, 2 Barr 194 ; 2 Greenlf. on Ev. sect. 297 ; Hannah *v.* Swarner, 8 Watts 11 ; Mayburry *v.* Brien, 15 Peters' R. 21 ; Thompson *v.* Lloyd, 13 Wright 127. The money should be brought into court : 2 Yeates 344 ; Youst *v.* Martin, 3 S. & R. 423 ; Peebles *v.* Reading, 8 Id. 496 ; Gregg *v.* Patterson, 9 W. &

[Reed v. Breeden.]

S. 197; Gore v. Kinney, 10 Watts 139; Churcher v. Guernsey, 3 Wright 87.

The opinion of the court was delivered, May 11th 1869, by

Agnew, J.—The only semblance of error complained of in this case is the answer to the plaintiff's 2d point, in which the court was asked to instruct the jury that the rents, issues and profits might be recouped against payment of the $40,000. Reed was to pay before delivery of the deed. It is thought that the court left it to the jury to find whether the deed was retained as a general security for payment, and in that event instructed them that a cash payment only would suffice. But an attentive examination of the charge shows that they submitted a single question of fact only resting on the testimony of Mr. Lucas. After refusing to answer the point affirmatively, the judge proceeded to state his reasons, to wit: that the action was not an equitable ejectment, in other words to enforce specific performance; for if the deed was delivered the plaintiff had a legal title; and if not delivered it was retained only for one of two purposes, first as a general security for payment, or second as an agreement making time of essence in the execution of the contract. It is evident it was not for the first, as there was no evidence that the deed was retained as a general security; for the testimony of Lucas was specific and pointed that the deed was withheld because of nonpayment, and was retained upon a distinct agreement making the payment at the appointed time of essence, and if not made at the time all negotiations were to be at an end. It is very clear, therefore, that no question could arise upon the recoupment of the rents, issues and profits, against the $40,000, and the case was narrowed down to the single question whether such an agreement to pay by a fixed time, as was stated by Lucas, existed. So the judge distinctly informed the jury, for after passing through his answers to the plaintiff's points, he summed up thus—" It follows, then, from our answers to these points that we submit this case to the jury upon a single question. Was the deed of 5th February 1864 held by Lucas under an agreement such as that to which he testifies, and destroyed in accordance therewith?" Lucas had testified that the sale by Breeden & Co. to Reed was not consummated by reason of Reed's failure to pay the $40,000, to meet the mortgage of the Portland Company, and the deed consequently was not delivered; and that Breeden and Reed finally agreed that the deed should remain undelivered until Reed paid the $40,000; of the time of payment of which Reed should have thirty days' notice; and in the meantime, if required, that Reed should give security for the timber taken off the property; and if he failed to pay the $40,000 or to give the security, the deed should be destroyed and all negotiations be at an end. The existence of this agreement

[Reed *v.* Breeden.]

the court then proceeded to leave to the jury as the ruling question in the cause, concluding their charge by saying—If you believe the evidence of Lucas, such a contract as justified the burning of the deed is shown. If you reject it or so much of it as relates to this subject, then there is no evidence of a contract left. The verdict was then made to turn on the decision of the question, if Lucas was believed, to be for the defendants, and if not, then for the plaintiff. It is very evident, therefore, that the case was not submitted to the jury on the answer to the 2d point.

That the right to destroy the deed and put an end to all negotiations for a sale, was the turning-point of the cause, is evident, and on this question Reed's letters of the 1st and 8th of March 1864 were strongly corroborative of Lucas's testimony. All the negotiations for the sale before the 5th of February 1864 were made dependent on the payment of the $40,000 upon the Portland Company's mortgage, which was pressing upon Breeden very heavily. The parties met on the 5th of February to close the sale, but Reed was not ready to pay, and Blake was in the city pressing payment of the mortgage. Breeden insisted on cash payment, and refused to close the bargain. As yet there was no consummated sale. Clearly it was Breeden's right to say: "I will not deliver the deed nor close the bargain, but I will let the matter stand open; and if you pay the $40,000 by a day to be named by the Portland Company, I will then close it upon the terms contained in the deed and the two accompanying papers; and if not, all negotiations shall be at an end." This was not a parol contract accompanying a written one, for the written bargain had not come into complete legal existence. There had been no delivery, and the deed was expressly to stand in abeyance as to delivery, until payment, while the two papers to accompany it were dependent on it, and were useless without it. Any other doctrine would prevent a party from preparing and executing a deed to be ready to perform a bargain, or to make a needful tender and demand of performance, for upon the opposite doctrine, the moment he did this, his title would be gone from him and vested in his adversary. The court was therefore clearly right in making the case turn on the agreement to pay the money testified to by Lucas.

There is no well-founded objection to the letter of Lucas to Reed, of the 8th February 1864, on the ground that it was insufficient as a notice. By the terms of the bargain, the only notice Reed was entitled to was of the time fixed for the payment of the $40,000 to the Portland Company's mortgage. This was given on the 8th of February 1864, by letter, and was recognised and acknowledged by Reed in his letters of 1st and 8th March 1864. Breeden's right to destroy the deed on failure to make payment on the 1st of April, the time fixed, followed from the very terms

[Reed v. Breeden.]

of the contract to which Reed was a party, and of which he was bound to take notice. Notice of the intention to destroy the deed and end the negotiations was unnecessary, as that right flowed directly from the non-payment of the money at the time, of which Reed was notified. The truth is, and it looks out at every step taken and every letter written by Reed, he either had not the money, and depended on a resale to raise it, or he chose voluntarily, for some reason known to himself, not to pay it. But of the fact that Breeden did act on the contract, and put an end to all negotiation, Read had immediate notice by Breeden's letter of the 2d of April 1864. After this all of Read's acts, such as his redemption of the lands on the 9th May 1864, were of no validity to keep the contract alive. The contract as proved by Lucas being found by the jury, the matter was at an end as concerns Reed, and the bona fides of the sale to Bradley was of no consequence except so far as it bore upon the credibility of Lucas's statement. Finding no error in the record, the

Judgment is affirmed.